UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

JILL A. WHITCOMB,

                Plaintiff,

      v.                                     Case No. 17-CV-14

THOMAS E. PRICE, M.D.
Secretary of the U.S. Department of Health
and Social Services,

                Defendant.

_____

**BRIEF IN SUPPORT OF PLAINTIFF'S REQUEST FOR JUDICIAL REVIEW**
_____

## I.   <u>INTRODUCTION</u>

Ms. Jill Whitcomb, a 51-year old mother, life-long Wisconsin resident, who taught pre-school before being forced on disability because of her brittle diabetes, returns to this court seeking judicial review of the Secretary's final decision. Since 2011, Ms. Whitcomb has been seeking Medicare coverage for the continuous glucose monitor ("CGM") that has kept her out of the emergency room and alive. Because the device is so critical, Ms. Whitcomb has been forced to use her limited funds to cover the CGM since 2011, thereby thwarting the very purpose of the Medicare program enacted by Congress.

To date, a Medicare administrative law judge has approved coverage for Ms. Whitcomb *twice*, yet the Secretary persists in his refusal. In its current iteration, the Secretary's denial concludes that:

    1)   although Ms. Whitcomb will suffer serious medical complications, including possible death, within a month without a CGM - the Secretary finds a CGM is not medically necessary;

9334975.16

2) although before using a CGM Emergency Medical Services had to be contacted several times a month to revive Ms. Whitcomb, and Emergency Medical Services has been contacted only twice in the six years she has been using one[1] – the Secretary finds a CGM for Ms. Whitcomb is not reasonable and medically necessary;

3) although a CGM is prescribed by a physician, approved by the FDA, and is acknowledged in clinical practice guidelines and peer-reviewed literature as a medical device - the Secretary holds a CGM serves no medical purpose; and

4) although the Secretary has approved more than 40 CGMs for others whose condition is indistinguishable from Ms. Whitcomb – inexplicitly and inconsistently, the Secretary holds the opposite in Ms. Whitcomb's case.

The Secretary's refusal to cover Ms. Whitcomb's claims is contrary to the administrative record (the "Record") in this case (which the Secretary did not address although the Court directed him to do so) and is contrary to law. Moreover, these conclusions are not supported by substantial evidence and are arbitrary and capricious. Accordingly, this Court should reverse the Secretary's final decision, order Medicare coverage, and bring this saga to a close.[2]

## II.    STATEMENT OF FACTS – CGM

### A.    Continuous Glucose Monitoring ("CGM")

Many people with diabetes manage their disease by finger stick glucose monitoring and, e.g., injections of insulin. However, a segment of the diabetic population cannot control their diabetes through conventional care and suffer significant complications including stroke, loss of consciousness, and eye/kidney/nerve damage. Uncontrolled diabetes is the number one cause of kidney failure, non-traumatic lower limb amputations, and new cases of blindness among adults.

---

[1] Both of those instances occurred when Ms. Whitcomb tried to stretch her limited funds by using CGM supplies after their recommended usage period. See Record at 1176-1180.
[2] Although this case started as a request for prior authorization for a CGM, given the lengthy pendency of the case, and the significant possibility of Ms. Whitcomb's death without one, Ms. Whitcomb acquired the CGM, the Dexcom G4, and now seeks coverage of it and its related supplies which have accrued since her initial request. If she had not paid for her CGM during the pendency of the appeal, she likely would have died rendering the case moot.

Record at 479. Because of the significant public health costs, the Secretary urges diabetics to control their diabetes.

The peer-reviewed literature establishes that the longer an individual lives with diabetes,[3] the greater their chances are of developing "hypoglycemic/hyperglycemic unawareness"[4] and the more erratic and more drastically glucose levels will change ("brittle diabetes"). Individuals with diabetes and unawareness lack physical sensations (e.g., sweating or shakiness) that might alert them that their glucose is low or high to enable them to take corrective action. It is estimated that one in 20 individuals with diabetes dies each year in their sleep due to an undetected fatal low, a.k.a., "dead in bed syndrome."[5] The life expectancy of an individual diagnosed with diabetes between 1950 and 1965 was 53.4 years.

A finger stick blood test indirectly measures blood glucose levels based on the amount of oxygen consumed in a reaction on a test strip which changes color (or causes an electric charge), and an algorithm may display a computed blood glucose level on a reader. Similarly, a CGM uses a needle that is inserted into interstitial fluid, and every five minutes (i.e., 288 times per day) computes and displays the blood glucose levels. Record at 286, 472. All CGMs:

> 1) alert patients of episodes of high glucose levels (hyperglycemia) and low glucose levels (hypoglycemia) so that patients can take action to control their blood glucose and avoid serious medical complications; and

> 2) provide trend information regarding how quickly glucose levels are dropping or rising.

The trend information is used by patients for the immediate short term management of their diabetes (e.g., "Do I have time to make it to the lunch meeting or should I pull over now and drink juice?"), and are used by clinicians for the long term management of diabetes (e.g., the

---

[3] Although two types of diabetes exist, as used in this brief, "diabetes" will refer to Type I diabetes.
[4] For the reader's ease, diabetes with hypoglycemic and hyperglycemic awareness will be referred to as "diabetes with unawareness."
[5] https://www.diapedia.org/acute-and-chronic-complications-of-diabetes/7105157816/dead-in-bed-syndrome
(accessed June 14, 2017).

patient is experiencing more frequent lows and extreme fluctuations in warm weather and thus should take higher and more frequent doses of glucose in summer months). CGMs have been the subject of multiple published peer-reviewed clinical studies, including large multi-center trials, all of which found improved clinical outcomes for patients who use a CGM. Record at 18, Attachment 3.[6]

## B. Consensus of Experts

In addition to the numerous peer-reviewed published studies, a broad consensus exists within the medical community that CGMs perform an essential medical function and are recognized as the standard of care for individuals with diabetes and unawareness, both nationally and internationally. Record at 149. The American Medical Association supports Medicare's coverage of CGM. Record at 18, Attachment 4. Independent government technology assessments find CGMs are reasonable and medically necessary for diabetes with unawareness. See e.g., Record at 18, Attachment 1. More than 95% of commercial payers cover CGMs as reasonable and medically necessary medical equipment for the management of diabetes with unawareness. Record at 148. United's national medical policy, based on its review of the literature, medical standards and practice guidelines, explicitly states:

> Long-term continuous glucose monitoring . . . is proven and medically necessary as a supplement to self-monitoring of blood glucose (SMBG) for patients with Type 1 diabetes who meet EITHER of the following criteria AND have demonstrated adherence to a physician ordered diabetic treatment plan:
>
> •Have been unable to achieve optimum glycemic control as defined by the most current version of the American Diabetes Association (ADA) *Standards of Medical Care in Diabetes*; or

---

[6] Inexplicably, the Secretary did not bate-stamp all the pages in the Record, but bate-stamped a photo of the CD containing certain documents which he produced without numbering. These unstamped documents are referenced by citation to the photo of the CD that contained them and the Attachment number identified on the CD.

•Have experienced hypoglycemia unawareness and/or frequent episodes of hypoglycemia.[7]

### C.  Ms. Whitcomb, The Medicare Beneficiary

In 2011, Ms. Whitcomb's clinicians prescribed a CGM to enable her to manage her brittle diabetes with unawareness. Ms. Whitcomb is 41 years old, was born with Type I diabetes, and is covered by Medicare because her diabetes with unawareness is so severe that she is on disability. Record at 1176. The Record establishes the following unrefuted facts:

•Ms. Whitcomb's blood glucose level can significantly change in a period as short as ten minutes. Record at 254, 265.

•Ms. Whitcomb has hypoglycemic unawareness, which means she cannot detect a sugar low, an extremely dangerous condition. Record at 247-8.

•Before using a CGM, Ms. Whitcomb was repeatedly discovered passed out on the floor because of her inability to detect low blood glucose. Record at 472; 9, CD 5:55-8:29.

•Ms. Whitcomb had been admitted to the emergency room numerous times because, despite frequent monitoring, she cannot detect changes in her glucose. Record at 291.

•Medicare has paid more than $14,000 for emergency room visits associated with Ms. Whitcomb's hypoglycemic unawareness and gastroparesis. Record at 19, CD 6:11-6:20.

•Emergency Medical Services was contacted to revive Ms. Whitcomb up to multiple times a week before using a CGM. Record at 1176, 1180.

•Since beginning to use a CGM in 2011, Emergency Medical Services has been contacted only twice, both of which were the result of trying to stretch her limited funds by using CGM supplies beyond their expiration date. Record at 1178-1180.

•A CGM provided a "vast improvement" of Ms. Whitcomb's blood glucose control and resulted in substantially fewer hypoglycemic events. Record at 472, 1179.

### III.  STATUTORY AND REGULATORY BACKGROUND

### A.  General Background of the Medicare Program

---

[7] Record at 18, Attachment 6, at p3.

The Medicare Act establishes a program of health insurance for the aged, disabled, and individuals with end-stage renal disease. 42 U.S.C. §§ 1395-1395ccc. This action arises under Medicare Part B. The Secretary, the Federal official responsible for administering the Medicare program, has delegated his responsibility to the Centers for Medicare & Medicaid Services ("CMS"), an agency within the department. In turn, CMS has contracted out many Medicare administrative functions, including payment, to private organizations. *See, e.g.*, 42 U.S.C. § 1395h. The contractors, among other things, process claims and set Medicare policy for a particular geographic region.

**B.      Medicare Coverage and Payment of Home Blood Glucose Monitors**

Durable Medical Equipment ("DME") is a benefit provided by Medicare Part B. Per the Social Security Act:

> The term "durable medical equipment" includes iron lungs, oxygen tents, hospital beds, and wheelchairs used in the patient's home . . . whether furnished on a rental basis or purchased, and includes blood testing strips and blood glucose monitors for individuals with diabetes without regard to whether the individual has Type I or Type II diabetes or to the individual's use of insulin.[8]

Thus, the statute merely provides examples of DME and does not explicitly define the term.

CMS has established criteria for a non-listed item to be designated DME. As interpreted:

> Durable medical equipment means equipment, furnished by a supplier or a home health agency that meets the following conditions:
>
> (1) Can withstand repeated use;
> (2) Is primarily and customarily used to serve a medical purpose;
> (3) Generally is not useful to an individual in the absence of an illness or injury; and
> (4) Is appropriate for use in the home.[9]

---

[8] Social Security Act §1861 (n).
[9] 42 C.F.R. §414.202.

DME must also be "necessary and reasonable for the treatment of the patient's illness or injury to improve the functioning of his or her malformed body member." Medicare regulations state that "[i]n most instances, no development will be needed to determine whether a specific item of equipment is medical in nature," but if such ambiguity exists, "this development would include the advice of local medical organizations . . . and specialists in the field of physical medicine and rehabilitation."[10] "[P]recautionary-type equipment (such as preset portable oxygen units) . . . are considered nonmedical in nature."[11]

A National Coverage Determination ("NCD") is "a determination by the Secretary that a particular item or service is covered nationally under Medicare." 42 C.F.R. § 405.1060(a)(1). An NCD is binding on all Medicare contractors, administrative law judges, and the Medicare Appeals Council ("Council"). 42 C.F.R. § 405.1060(a)(4). CMS issued an NCD relating to durable medical equipment - NCD 280.1. That determination:

1)   reiterates the four requirements for an item to be DME;

2)   includes exemplars of items considered to be DME; and

3)   indicates that if an item does not appear among the generic categories listed, the Medicare contractors should consider whether an item is covered under Medicare's DME benefit based on the advice of medical consultants by taking into account:

   a.   whether the item has been approved by the United States Food and Drug Administration ("FDA") and is otherwise generally considered safe and effective; and

   b.   whether it is reasonable and necessary for the patient.

---

[10] MBPM" Ch. 15, §110.1.B.
[11] Id. at §110.1.B.2

NCD 280.1 indicates blood glucose monitors are considered to be DME provided the Medicare beneficiary (not a specific device) satisfies certain conditions.[12]  Medicare has covered glucose monitors since at least 1995.

### C.  Local Coverage Determinations and Articles

A Medicare contractor processing claims may (but is not required to) establish a local coverage determination ("LCD") that applies to the claims processed by that contractor.  An LCD may not conflict with an NCD.  LCDs are based on the peer-reviewed literature, general acceptance by the medical community, and are developed in consultation with the relevant medical community.[13]  An LCD that is contrary to the standard of care must be based on sufficient evidence to convincingly refute evidence presented in support of coverage.[14]

Consistent with the NCD, the relevant contractor (National Government Services), issued an LCD indicating the coverage criteria for blood glucose monitors and related supplies.[15]  The LCD does not indicate continuous glucose monitors are not a covered service, but includes the relevant billing codes for a CGM.  LCDs are not binding on an administrative law judge ("ALJ") although they are entitled to deference.  42 C.F.R. § 405.1062(a).  An ALJ can decline to follow an LCD if the ALJ provides a rationale.

"Articles" are informal communications issued by contractors without consultation with the relevant medical community.  Articles typically address billing or coding issues.  Articles, by design, do not contain coverage determinations – only non-reasonable and necessary language can be communicated through articles.  See https://www.cms.gov/medicare-coverage-database/ (accessed on June 16, 2017).  Billing guidance explicitly is not a coverage policy.  Because they

---

[12] Those conditions are specified in NCD 40.2, which states glucose monitors are covered if (1) the patient has a diagnosis of diabetes; (2) the patient can use the prescribed device; and (3) the device is designed for home use.

[13] See Medicare Program Integrity Manual ("MPIM"), Ch. 13, §§ 13.7, 13.7.1, and 13.8.

[14] MPIM, Ch. 13, §13.8.

[15] National Government Services LCD 27231.

should not contain coverage information, Articles are not subject to challenge by Medicare beneficiaries. 42 C.F.R. § 426.325(b)(9).[16] Under Medicare regulations, a contractor's Article is not entitled to any deference.[17] Effective January 1, 2007, the Medicare contractor, National Government Services, modified Article A47238, an article on glucose monitors, stating it considered CGMs "precautionary."[18]

### D. Medicare Advantage Plans

Medicare Advantage Organizations ("MAOs" or "Plans") offer health insurance plans that cover at least all the services, devices and supplies a Medicare beneficiary is entitled to receive under Medicare Part B. Claims for payment for devices and supplies provided to Medicare beneficiaries are presented to the Plan for claims processing. The Plan is bound to cover all items covered through an NCD and/or LCD. United Healthcare of Wisconsin/Secure Horizons (hereinafter "United") is an MAO. Plans are charged with knowing the standard of care. 42 C.F.R. §422.504. United conceded its Evidence of Coverage does not specifically exclude continuous glucose monitoring, but it does indicate that it covers glucose monitors. Record at 260, 982, 1137 and 1147.

### E. Appeals of Medicare Claims Decisions

Congress established a five-step process for a Medicare beneficiary to follow to obtain judicial review when she is dissatisfied with the Secretary's coverage determination of a claim for a device and supplies. The first step in the process is to request redetermination by the Plan that made the initial negative determination on the claim. 42 C.F.R. §§ 405.940-405.958. For

---

[16] See infra, section III, C.
[17] This Court has already ruled on that issue. See infra, section III, C.
[18] Although in May 2017 the Article was revised to remove the statement that CGM is precautionary, the Article remained substantively the same during the relevant period.

the second step, the beneficiary can request reconsideration by a qualified independent contractor ("QIC"). 42 C.F.R. § 405.960. No hearing is held at these first two steps.

If the QIC decision is unfavorable, the beneficiary may request a hearing before an ALJ. 42 C.F.R. § 405.1000. The ALJ reviews the record forwarded by the QIC, and any additional evidence offered by the parties, and conducts a hearing. 42 C.F.R. §§ 405.1000 *et seq.* A Plan or beneficiary may present witnesses in support of their position. An ALJ is bound to follow an NCD and must give deference to an LCD or explain why the LCD was not followed. "[A]n ALJ may rule that Medicare payment is due on a particular item or services received by a beneficiary, based on the particular circumstances represented by the case, even if the contractor's . . . LCD clearly prohibits payment for the particular services." 68 Fed. Reg. 63693 (Nov. 7, 2003). A Plan may appeal an ALJ decision to the Medicare Appeals Council ("Council"). 42 C.F.R § 405.1102. Again, an NCD is binding on the Council. 42 C.F.R. § 405.1060(a)(4). The Council typically does not conduct a hearing or allow oral argument, but has discretion to do so.[19] 42 C.F.R. § 405.1124. The Council's decision is the Secretary's final agency decision for purposes of judicial review. 42 U.S.C. §§ 1395ff(b) and 405(g).

The Secretary's decisions are reviewed under the APA standard and must be based on substantial evidence in the record and must not otherwise be arbitrary, capricious, or an abuse of discretion. 42 C.F.R. § 405.1136(f).

## IV.    Prior Administrative Proceedings

### A.    Ms. Whitcomb's Appeals

Ms. Whitcomb was prescribed a CGM in 2011 to enable her to better manage her diabetes. United and the QIC denied the claim citing Article A47238. Ms. Whitcomb appealed to an ALJ. Judge Bush conducted hearings in 2012 and Ms. Whitcomb, her caregiver, and her clinician

---

[19] The Council did not conduct a hearing for the decision in this action.

provided testimony in support of coverage. Ms. Whitcomb also submitted medical records and a video of a recent emergency visit in support of her claim. Record at 19, 637-698. United provided no medical testimony in support of its denial.

In his February 6, 2013 fully favorable decision, Judge Bush found he was bound to follow the Secretary's NCD 40.2 which provided for coverage of glucose monitors. Record at 365. He also found LCD L27231 provided coverage for glucose monitors and Ms. Whitcomb satisfied its coverage criteria. Record at 365-66. Although he was not required to give Article A47238 deference because it is not an LCD, Judge Bush indicated he would not follow the Article based on Ms. Whitcomb's clearly demonstrated medical need. He noted her frequent episodes of hypoglycemia, her emergency room visits, hospitalizations, and her dangerously low blood sugars.[20] Record at 365. He further noted that with a CGM, Ms. Whitcomb was much better able to manage her diabetes, the CGM was reasonable and medically necessary for Ms. Whitcomb, and coverage of it was consistent with NCD 40.2 and LCD L27231. Record at 366.

United appealed the first ALJ decision, although United conceded that a CGM "may be useful" to Ms. Whitcomb.[21] The Council, in reviewing United's appeal, elevated Article A47238 (which should not contain coverage information) to LCD status. As noted above, even an LCD is not binding on an ALJ if the ALJ provides a rationale for departing from the LCD. Elevating Article A47238 to LCD status, the Council stated the Article explicitly excluded CGM coverage. Further, ignoring the ALJ's recitation of Ms. Whitcomb's dire medical condition and his reasons for departing from A4728 even if it were treated as an LCD, the Council found, "The record contains insufficient evidence to support departing from the non-coverage of continuous glucose monitor systems." Record at 329.

---

[20] Ms. Whitcomb's levels were 13. Blood sugars should be between 70 and 160. At 13, an individual typically is unconscious.
[21] Record at 351.

Ms. Whitcomb sought judicial review of the August 23, 2013 Council decision. On May 26, 2015, this Court vacated the Council's 2013 decision finding that the Council's application of the Article was improper and remanded the case back to the Secretary to determine "whether a continuous glucose monitor is reasonable and medically necessary for [Ms.] Whitcomb and not otherwise excluded" from Medicare coverage. Record at 212-221.[22] The Council remanded the case back to the ALJ. On October 14, 2015, the ALJ issued a second fully favorable decision for Ms. Whitcomb. The ALJ found that a CGM meets the Medicare definition of DME,[23] a CGM is eligible for Medicare coverage under the Medicare DME benefit, and that it is reasonable and medically necessary for Ms. Whitcomb to manage her diabetes.

United appealed the ALJ's second favorable decision. On November 8, 2016, the Council again issued a decision (the "Decision) denying coverage of a CGM asserting that a CGM does not serve a medical purpose (because a user should confirm a CGM reading with a finger stick before making an insulin adjustment) but is simply precautionary and therefore not covered under Medicare's DME benefit. Record at 10.[24]

## B.    Related Administrative Proceedings

Other Medicare beneficiaries have appealed denied CGM claims. More than 40 ALJ decisions have concluded that a CGM was DME eligible for coverage as a Medicare benefit and reasonable and medically necessary for individuals with diabetes and unawareness.[25]

In April 2016, the Department of Health and Human Services Civil Remedies Division found that CMS' "long-standing policy of broadly construing the DME benefits category is

---

[22] See also *Finigan v. Burwell*, 189 F.Supp. 201 (D. Mass 2016) (finding application of the Article an improper basis for denying coverage of a CGM).
[23] The ALJ described how the CGM satisfied each element of the NCD 280.1 definition of DME.
[24] Although the Medicare regulations and statute require the Council to issue a decision within 90 days of an appeal, and although Ms. Whitcomb sought to escalate the case to District Court when the Council failed for the second time to render a timely decision (Record at 43), the Council denied her request (Record at 41-42) and did not render a decision until more than nine months after the prescribed statutory period. Record at 1-12.
[25] http://dparrishlaw.com/medicare-acknowledges-dexcoms-g5-as-a-covered-medicare-benefit/

consistent with Congressional intent" and that "there is no peer-reviewed literature, medical opinions, or even any analysis from an individual with a medical background that supports a conclusion that CGM is never reasonable and necessary irrespective of the beneficiary's condition."  The HHS Civil Remedies Division deemed the Article that stated CGM was precautionary to be invalid under the reasonableness standard.[26]  Record at 18, Attachment 7.

## V.  STANDARD OF REVIEW

Under the Medicare statute, 42 C.F.R. § 1395ff(b), the final agency decisions included in this action are subject to judicial review under the applicable provisions of the APA. *Heart 4 Heart, Inc. v. Sebelius*, 2014 WL 3028684, *5 (C.D. Ill. 2014) (treating submission as request to review decision by Medicare Appeals Council rather than summary judgment motion).  Accordingly, this Court's review of the Secretary's actions is governed by 5 U.S.C. § 706 of the APA, which requires the Court to determine whether, *inter alia*, his actions are arbitrary and capricious, an abuse of discretion, not based on substantial evidence, or otherwise not in accordance with law. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414-17 (1971).  If so, the Court must set it aside.

In *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), the Supreme Court described the "arbitrary and capricious" standard as follows:

> Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[26] A Medicare beneficiary filed an LCD challenge asserting that the Article was a constructive LCD.  The HHS Civil Remedies Division found the CGM met the requirements of NCD 280.1 and deemed the Article invalid under the reasonableness standard.  CMS appealed the decision and the Board ruled the LCD challenge process could not be used to challenge the Article.  Although the decision was vacated on jurisdictional grounds, the substantive ruling, that if the Article had been an LCD it was not supported by substantial evidence, is instructive.

*Id.* at 63.  Similarly, the "substantial evidence" standard requires an in-depth review of the facts relied upon by the agency in its decision:

> A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the [Secretary]. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the [Secretary].

*Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983); *accord Brown v. Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986) ("Our review in substantial-evidence cases calls for careful scrutiny of the entire record.").  See also *Heart 4 Heart, v. Sebelius*, 2014 WL 3028684 (C.D. Ill)(citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  A reviewing court may uphold agency action only on the basis articulated by the agency in its decision, not on *post-hoc* rationalization offered by the agency or its counsel. *Roddy v. Astrue*, 705 F.3d 631,636, 637 (7th Cir. 2013); s*ee Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 631 n.31 (1980); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962); *Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345, 348 n.12 (D.C. Cir. 1987).

Although deference to the Secretary's actions may be appropriate under certain circumstances, such deference is inappropriate here because the Secretary denied coverage for Ms. Whitcomb's CGM despite covering CGMs for medically indistinguishable Medicare beneficiaries.  In *Malcomb v. Island Creek Coal Co*., 15 F.3d 364 (4th Cir. 1994), the court stated:

> An agency's interpretation of its own regulations is normally entitled to judicial deference. We accord this deference to the agency's interpretation even if the agency has made considered changes in that interpretation because '[a]n initial agency interpretation is not instantly carved in stone' and the agency should be free to 'consider varying interpretations and the wisdom of its policy on a continuing basis.' When the agency's varying interpretations of a regulation have not been the result of the agency making considered changes in its policy, but rather of the agency simply acting inconsistently without explanation, however, 'the case for judicial deference is less compelling.'  **Moreover, if the agency's**

> *record of unexplained inconsistent interpretation is particularly egregious, the interpretation that the agency applied in the case before the court is entitled to no deference*.

15 F.3d at 369 (emphasis added; citations omitted). In reversing the government, the Fourth Circuit continued:

> We find the interpretation of its cross-appeal regulations that the Board applied in the case at bar to have been shockingly inconsistent with its prior and subsequent interpretations.

Finally, no deference is due to the Secretary's Decision because it conflicts with the Secretary's binding NCD 280.1. *See Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999) (no deference due to agency action which does not follow the agency's own regulations); s*ee also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) (no deference due to agency interpretation that contradicts the regulation's plain language.); *see also University Health Servs. v. HHS*, 120 F.3d 1145, 1149 (11th Cir. 1997) ("The Secretary's interpretation of her own regulations are 'controlling unless plainly erroneous or inconsistent with the regulation.'") (citations omitted).

## VI. <u>ARGUMENT</u>

The Secretary makes fundamental errors in his Decision. First, the Secretary asserted, without substantial evidence, and contrary to the overwhelming evidence in the Record, that a CGM does not serve a medical purpose and therefore does not satisfy the definition of DME. A CGM is the primary and only means by which certain individuals with diabetes can control their disease, it serves medical purposes not served by any other medical device, and a confirmatory finger stick does not indicate that a CGM serves no medical purpose. Second, the Secretary's Decision is arbitrary and capricious because the Secretary had not followed his published policies and has paid for CGMs for medically indistinguishable beneficiaries. Despite the

Secretary's NCDs and numerous public statements regarding the need for diabetics to test frequently and control their diabetes, the Secretary denied the claim for a Medicare beneficiary who needs a CGM to control her diabetes and complications therefrom. As explained below, the Secretary's Decision is not supported by substantial evidence, is arbitrary and capricious, and otherwise contrary to law, and must be reversed by this Court.

### A. A CGM Is Primarily and Customarily Used to Serve a Medical Purpose; The Secretary's Contrary Finding is Not Supported by Substantial Evidence

#### 1. A CGM Is Uniformly Acknowledged As A Medical Device

CMS has a long history of construing the DME benefit broadly, as Congress intended. Record at 18, Attachment 7 at 18 (citing HCFA Ruling 96-1 at 6 and DAB No. 1999 at 3 (2005)). CMS has observed that "in most instances, no development will be needed to determine whether a specific item of equipment is medical in nature" and that when such "development" is needed, it will be based on consultation with specialists and medical societies. See MBPM, Chapt. 15, §110.1(B)1. The FDA, government technology assessments, the National Institutes of Health, the relevant professional medical societies, experts in the care of diabetes and commercial insurance payers deem CGM to be a medical device.[27] No medical expert has opined otherwise.

The Secretary's Decision and Answer[28] indicate that contrary to the requirements, the Secretary did not consult with or consider the opinions of specialists or medical societies[29], or

---

[27] See Complaint ¶¶ 76 - 80; Record at 18.
[28] The Secretary asserted he lacked sufficient information or knowledge regarding the various cited consensus statements of national and professional organizations recommending CGM, the federally funded technology assessment, peer-reviewed publications, and the widespread acceptance of CGM. See Secretary's Answer at 8-9.
[29] MBPM, Chapt. 15, §110.1(B)1.

Case 2:17-cv-00014-DEJ   Filed 06/20/17   Page 16 of 23   Document 15

consider the peer-reviewed literature[30] or standards of medical care,[31] and his Decision does not reflect either awareness or consideration of the same.

Further, as the Secretary concedes, "precautionary" is not a statutorily defined term. Record at 10. However, the exemplar of precautionary equipment, a spare preset oxygen tank, underscores the difference between such a "precautionary device" and a CGM. Precautionary devices are backups generally used episodically. In contrast, a CGM is used for the continuous medical management of diabetes and is the <u>primary</u> method of glucose monitoring for individuals with diabetes and unawareness.

### 2. A CGM is the Primary Means By Which Beneficiaries with Diabetes and Unawareness Control Their Diabetes

Individuals with brittle diabetes and unawareness are unable to control their diabetes despite conducting multiple finger sticks a day– they cannot catch the rapid and extreme changes in their glucose level and they lack any physical sensations that might otherwise warn them to take corrective action. No one can conduct a finger stick while sleeping – the time when most diabetics suffer fatal lows.[32]

Accordingly, CGM is the primary means by which such individuals control their diabetes. Because such individuals have such erratic glucose levels, potentially debilitating or fatal lows can occur rapidly without the glucose trend information and alarms provided by a CGM. As a practical matter, without a CGM, such individuals may not be conscious to take any corrective action. A CGM is not a secondary, back up alarm system – it is the primary means by which such individuals control their diabetes and without which they cannot control it. Contrary to the

---

[30] Record at 18, Attachment 3. See MPIM §13.7.1 indicating peer-reviewed literature should be considered in making coverage decisions.
[31] The consensus of the medical community is a primary factor in making coverage determinations. See MPIM, Ch. 13, §13.7.1.
[32] See fn 12. In this regard, the undersigned challenges the Secretary's representatives to conduct finger stick tests every five minutes all day (including the overnight hours) for the two days preceding the hearing on this matter.

Secretary's assertion that a CGM "is essentially used as an additional precaution" and does not primarily serve a medical purpose[33] - it is the only medical device that allows them to control their diabetes.

### 3. A CGM Provides Medical Information No Other Medical Device Provides

In his Decision, the Secretary asserts that because the CGM's readings should be confirmed by a finger stick before adjusting insulin, a CGM is redundant to a finger stick and serves no medical purpose. The Secretary's Decision is based on a mistake of fact - a CGM provides actionable medical information that no other medical device provides. Finger sticks do not provide glucose trend information that indicates how quickly a glucose level is changing and whether it is rising or falling. Patients use such trend information in the short term to determine whether an insulin adjustment must be made immediately or whether it can be deferred. Clinicians use trend information for the long term management of diabetes. A CGM provides a "video" of glucose levels while a finger stick provides a snapshot. Further, a finger stick cannot provide notice of an impending dangerous high or low – critical information, particularly when sleeping or driving.

### 4. Adjunctive Use/Confirmatory Testing Does Not Negate A Device's Medical Purpose

The Secretary argues that because the FDA label indicates CGM values should be confirmed by a finger stick, a CGM does not serve as a basis for an insulin adjustment and therefore does not serve a primarily medical purpose. However, such confirmation does not negate a CGM's customary and primary medical purpose. At a minimum, a CGM ensures a finger stick is conducted at the critical moment. Further, even if a CGM is adjunctive to a finger stick (which it is not, it is the primary means of monitoring glucose), such adjunctive use does

---

[33] Record at 10.

not negate its medical purpose as the Secretary has acknowledged in numerous NCDs and coverage policies.

### a. An Adjunctive FDA Label Does Not Deprive a Medical Device of a Primary Medical Purpose

The Secretary asserts that a CGM does not primarily serve a medical purpose because it is adjunctive to a finger stick is belied by a cursory review of NCD 280.1, a partial list of deemed DME, that reflects Medicare coverage of "augmentative" or "adjunctive" devices: continuous passive motion devices (DME used as an adjunct to physical therapy following surgery); oxygen humidifiers (an adjunct to home oxygen machines, another DME device); muscle stimulators, augmentative and communication devices.  As if to underscore the unsoundness of his current position, in NCD 280.1, the Secretary recognizes the primary medical purpose (and covers as DME), a self-contained pacemaker *monitor* that ensures that a pacemaker is functioning properly, i.e., DME whose sole function is to ensure the proper functioning of another medical device.

His position is further belied by a cursory review of his numerous coverage decisions extending Medicare coverage to other "adjunctive" devices and medications.[34]  The Secretary also acknowledges the primary medical purpose of numerous medical monitors (including heart monitors, respiratory monitors, oxygen saturation monitors), and Medicare covers them.

### b. Confirmatory Testing Does Not Negate A Medical Purpose

The Secretary recognizes the primarily medical purpose and necessity of numerous medical tests that are confirmed by subsequent tests or that direct additional testing.  Medicare

---

[34] See e.g., NCD 10.2 ("TENS may be covered whether used as an adjunct to the use of drugs, or as an alternative to drugs, in the treatment of acute pain resulting from surgery");  NCD 20.29 ("the use of [hyperbaric oxygen] therapy is covered as adjunctive therapy");  NCD 270.1 ("The use of ES and electromagnetic therapy for the treatment of wounds are considered adjunctive therapies, and will only be covered for chronic . . . diabetic ulcers, and venous stasis ulcers.");   NCD 150.2 (covering a bone stimulator to augment bone repair following surgery).

covers both the first "presumptive" test and the secondary confirmatory test in many circumstances including testing for drugs of abuse.[35] Indeed, Medicare covers entire classes of medical tests that are performed solely on the basis of the results of a first Medicare-covered test, i.e., reflex testing - if the value of the first test exceeds a designated threshold, the second test is performed. Thus, a possible confirmatory test does not impair the primarily medical nature of a CGM. The Secretary cites no authority for his novel statement that a device loses its medical purpose if either a confirmatory test is performed or another medical device is used.[36]

Thus, the Secretary has recognized, through NCD 280.1 and numerous national coverage policies, the primary medical purpose of numerous devices that serve an adjunctive purpose and qualify for coverage under the DME benefit. Further, Medicare covers numerous medical monitors and laboratory tests that prompt secondary testing. A CGM's "adjunctive" FDA approval did not and does not deprive a CGM of its primary and customary medical purpose. Indeed, the Secretary concedes that a CGM is only useful to individuals who have diabetes and it is used to manage that medical condition, i.e., it has no application outside of a medical context.

### 5. The Lack of Medical Reasonableness and Necessity for Ms. Whitcomb is Not Supported by Substantial Evidence

Although this Court instructed the Secretary to determine whether a CGM is reasonable and medically necessary for Ms. Whitcomb, the Secretary did not undertake such an analysis because he determined a CGM does not serve a medical purpose. The unrefuted, overwhelming evidence in the Record establishes that a CGM was and is reasonable and medically necessary for Ms. Whitcomb who has brittle diabetes with unawareness, and suffers significant

---

[35] http://www.palmettogba.com/palmetto/providers.nsf/vMasterDID/A59PK51218?OpenDocument.
[36] The Secretary's logic would make all monitoring devices non-medical or precautionary in nature. For example, a heart monitor would be non-medical because a different medical device, a defibrillator, is required to restart a stopped heart. The Court in *Finigan* noted such logic was "head-scratching" at best. *Finigan* at fn. 6.

complications resulting in significant cost to Medicare.  No clinician reviewing Ms. Whitcomb's record opined that she did not have a dire need for a CGM.  As Judge Bush found, Ms. Whitcomb's dire need for the CGM is supported by the medical records.

The Secretary did not discuss Ms. Whitcomb's medical condition, her inability to detect glucose lows without the CGM, the significant complications that can and have resulted from her hypoglycemic unawareness, her significantly improved control with a CGM, and the significant cost to Medicare when Ms. Whitcomb is unable to control her diabetes.  Not only did the Secretary not discuss the foregoing, but he did not discuss a reason for rejecting the opinion of Ms. Whitcomb's physicians and providers.

Although a treating physician's determination of medical necessity is not dispositive of Medicare coverage, the Secretary should place significant reliance on such decisions or provide a reasoned basis for failing to do so.  See *Klementowski v. Secretary of HHS*, 801 F. Supp. 1022 (W.D.N.Y. 1992) citing *State of New York v. Sullivan*, 927 F.2d 57, 60 (2d Cir. 1991). [37]  This is especially compelling where, as in the cases herein, there is "no direct conflicting evidence." *Kuebler v. Secretary of U.S. Dept. of Health & Human Services*, 579 F. Supp. 1436 (D.C. N.Y. 1984).  Because CMS has never adopted specific regulations specifying what might constitute medical necessity in each case, reliance on a treating physician's opinion of medical necessity is even more important than in the Social Security context.  See *U.S. v. Prabhu*, 442 F. Supp.2d 1008, 1032 (D. Nev. 2006).  In fact, the Ninth Circuit has commented that the Secretary should not reject the opinion of a claimant's physician without clear and convincing evidence to do so. *Vista Hill Foundation, Inc. v. Heckler*, 767 F.2d 556 (9th Cir. 1985).  Ms. Whitcomb's treating practitioners' opinions are supported by the medical record, there is no evidence to the contrary

---

[37] See also *Roddy v. Astrue*, 705 F.3d 631,636, 637 (7th Cir. 2013); *Senn v. Astrue*, 2013 WL 63257 (E.D. Wis.).

in the Record, and the Secretary has failed to provide a "reasoned basis" for refusing to accept their opinions.  See *Heart 4 Heart* at 8 - 9.

### B.    The Decision is Arbitrary and Capricious Because it is Inconsistent with NCDs and Previous Decisions

The Secretary's Decision is arbitrary and capricious because: (1) it conflicts with the NCD 280.1; and (2) it is contrary to more than 40 final decisions.  A CGM satisfies the definition of DME found in NCD 280.1.  Coverage of glucose monitors is specifically contemplated in NCD 280.1.  No exclusion is made for CGMs.  As noted above, the Secretary has issued numerous NCDs extending coverage to "adjunctive" devices, monitors and tests that must be confirmed.

Finally, the Secretary repeatedly has found CGMs to be DME and a covered Medicare benefit for other Medicare beneficiaries whose medical condition is indistinguishable from Ms. Whitcomb's condition.  See fn 18.  The Secretary ignores his inconsistent final rulings simply asserting in this matter he is determining whether a CGM "falls within a statutory benefit category," although he must have made such a determination in the other cases.  Thus, the Secretary's denial is arbitrary and capricious and must be reversed.  In *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1246, 1260 (D.C. Cir. 1996), the court stated:

> The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent.  That is the very meaning of the arbitrary and capricious standard.

### VII.   CONCLUSION

The Secretary's Decision is contrary to law and facts.   A CGM performs medical functions not performed by any other medical device and is the only device that enables beneficiaries with diabetes and unawareness to control their disease.  It meets the Secretary's definition of DME and is recognized as the standard of care.  The Decision is not supported by substantial evidence in the Record, or any relevant evidence.  Further, the Decision is arbitrary and capricious as it conflicts

with his NCD and his prior determinations regarding CGM.  For the foregoing reasons, this Court

should grant Plaintiff Whitcomb's Motion.

Date: June 20, 2017

Respectfully submitted,

PARRISH LAW OFFICES
Attorneys for Plaintiff

/s/ Debra Parrish

_____

By: Debra Parrish
788 Washington Road
Pittsburgh, PA  15228
TEL    412-561-6250
FAX    412-561-6253
Email  Debbie@dparrishlaw.com


MCNALLY PETERSON, S.C.
Attorneys for Plaintiff
By: Robert Theine Pledl
1233 North Mayfair Road - Suite 200
Milwaukee, WI  53226
TEL    414-257-3399
FAX    414-257-3223
Email  rpledl@mcpetelaw.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 20th day of June, 2017, I electronically filed Plaintiff's

Motion for Summary Judgment, with supporting papers, using the Eastern District of Wisconsin

CM/ECF system which will automatically send email notification of such filing to counsel of record

for Defendant.